## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM R. DAVIS,           )
                            )
            Plaintiff,      )
                            )    2:18-cv-01200
        v.                  )
                            )
CINTAS CORPORATION,         )
                            )
            Defendant.      )

## OPINION

### Mark R. Hornak, Chief United States District Judge

Plaintiff, William Davis ("Davis"), was employed by Defendant, Cintas Corporation ("Cintas"), as a route sales driver in the Western Pennsylvania area.[1] Following a personal tragedy, Mr. Davis was diagnosed with cardiac issues, anxiety, and depression. Mr. Davis alleges that he was denied reasonable accommodations for his disabilities and was discriminated against on the basis of his age and disabled status, in violation of federal and state anti-discrimination laws. Mr. Davis and Cintas entered into an employment agreement that provided in relevant part that any claim arising out of the employment relationship, including alleged violations of federal and state anti-discrimination laws, must be resolved through impartial and confidential arbitration.

---

[1] Counsel for Mr. Davis described the position as a "Service Sales Representative" in Davis's Brief in Response to the Motion to Compel Arbitration. (ECF No. 20 at 3). It appears to the Court that another court used this nomenclature in describing a position that appears to be identical to Davis's in adjudicating a motion to compel arbitration in a separate case involving Cintas employees. *See Veliz v. Cintas Corp.*, No. C 03-1180, 2004 WL 2452851 (N.D. Cal. Apr. 5, 2004), *modified on reconsideration on other grounds*, No. 03-01180, 2005 WL 1048699 (N.D. Cal. May 4, 2005). However, only the term "route sales driver" was used in the Complaint (ECF No. 1) and Mr. Davis's declaration in response to this Motion, (ECF No. 21), so the Court will use this nomenclature to denote Mr. Davis's job title for the purposes of this Motion.

Now before the Court is Cintas's Motion to Compel Arbitration (ECF No. 14), pursuant to 9 U.S.C. § 4. The Motion has been fully briefed and the Court held Oral Argument on the Motion on March 19, 2019. (ECF No. 27). The Court concludes that Davis and Cintas agreed to submit the claims of the underlying lawsuit to arbitration and there are no grounds in law or equity to not enforce this agreement. For these and other reasons that follow, Cintas's Motion will be GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

The underlying claims in this litigation stem from allegations that Cintas, Mr. Davis's former employer, violated the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Pennsylvania Human Resources Act (the "PHRA"), 43 Pa. C.S. §§ 951 *et seq.*, by failing to provide reasonable accommodations for Mr. Davis and allegedly terminating his employment in favor of a younger, less-qualified, and non-disabled employee. (Compl. ¶¶ 14–15, 22–25, 27, 30, 32, 35–36, ECF No. 1).[2]

Mr. Davis was initially hired as a truck unloader by Cintas on November 13, 1989. (Compl. ¶ 11). He was promoted to route sales driver in or around 1992 and held that position until his employment was terminated on June 2, 2016. (*Id.* ¶¶ 11, 35). Mr. Davis's job responsibilities included delivering fresh uniforms, picking up dirty uniforms, delivering other supplies to Cintas customers, and "servic[ing] existing customers and tr[ying] to get customers interested in other Cintas products." (Declaration of William R. Davis ("Davis Dec.") ¶ 3, ECF No. 21).

---

[2] Davis alleges additional jurisdictional facts, such as that Cintas employed more than twenty employees at all material times, (Compl. ¶ 12), and facts regarding his exhaustion of administrative remedies, (*id.* ¶¶ 2–4).

On September 14, 2015, Mr. Davis executed an employment agreement with Cintas (the "Agreement"), a copy of which is attached to Cintas's Motion as an exhibit. (Declaration of Jeff Borak ("Borak Dec.") ¶ 9, ECF No. 15-1; *see also* Agreement at 1, Exh. A, ECF No. 15-1). Mr. Davis claims that he did not sign a similar agreement or form when he was initially hired by Cintas in 1989. (Davis Dec. ¶ 5). The purported consideration for the formation of the Agreement was an increase in Mr. Davis's salary. (Agreement at 2; Davis Dec. ¶ 7). Mr. Davis further alleges that he was required to sign the Agreement to remain employed with Cintas, that the Agreement was not explained to him when he signed it, and that he did not receive a copy of the Agreement, or any form like it, during his employment. (Davis Dec. ¶¶ 7, 10).

Section Eight of the Agreement contains an agreement to arbitrate, which states the following, in relevant part:

> The rights and claims of Employee covered by this Section 8, including the arbitration provisions below, specifically include but are not limited to all of Employee's rights or claims arising out of or in any way related to Discrimination in Employment Act, as amended, Title VII of the Civil Rights Act of 1964, as amended (including amendments contained in the Civil Rights Act of 1991), the Americans With Disabilities Act, 42 U.S.C. § 1981, the Fair Labor Standards Act, the Employee Retirement Income Security Act, state anti-discrimination statutes, other state or local laws regarding employment, common law theories such as breach of express or implied contract, wrongful discharge defamation, and negligent or intentional infliction of emotional distress. . . .

> Either party desiring to pursue a claim against the other party will submit to the other party a written request to have such claim, dispute or difference resolved through impartial and confidential arbitration. The place of arbitration shall be in the county and state where Employee currently works for Employer or most recently worked for Employer. Any such request for arbitration must be submitted within one year of the state when the dispute or difference first arose or within one year of when the Employee's employment ends, whichever occurs first, unless a party claims a violation of a specific statute having its own specific statute of limitations, in which event that statutory time limit will apply.

-3-

(Agreement at 5–6). Cintas asserts that all of Mr. Davis's claims in his lawsuit fall within the scope of the agreement to arbitrate and that the Court must compel Mr. Davis to submit his claims to arbitration in the manner outlined in Section Eight of the Agreement.

## II.    DISCUSSION

### a.   Standard of Review[3]

A motion to compel arbitration should be analyzed under a Rule 12(b)(6) standard, *i.e.*, the same standard used when adjudicating a motion to dismiss, when it is "apparent, based on "the face of a complaint, and documents relied upon in the complaint," that certain of a party's claims "are subject to an enforceable arbitration clause."" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). However, "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue" then limited discovery may be granted prior to a court ruling on a renewed motion to compel arbitration utilizing a Rule 56, *i.e.*, summary judgment, standard. *Guidotti*, 716 F.3d at 776.

Neither the agreement to arbitrate, nor the larger Agreement in which it appears, is attached to, affirmatively incorporated into, or specifically mentioned in the Complaint. However, this alone is not a basis to conclude that the Rule 56, rather than Rule 12(b)(6), standard of review should be applied. *Guidotti*, 716 F.3d at 772 (explaining that under the Rule 12(b)(6) standard "only the complaint, exhibits attached to the complaint, matters of public record, *as well as* undisputedly authentic documents if the complainant's claims are based upon

---

[3] Neither party raised this issue, or otherwise discussed or mentioned it, in their papers or during Oral Argument.

-4-

these documents" may be considered) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)) (emphasis added); *see also In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (observing that courts may consider a "document integral to or explicitly relied upon in the complaint" at the motion to dismiss stage "without converting the motion to dismiss into one for summary judgment") (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)) (emphasis and alterations omitted). The relevant question, therefore, is whether the Agreement is "integral or explicitly relied upon in the complaint" such that it should be considered at this juncture. The Court has little difficulty in concluding that it should be.

*Curtis v. Cintas Corporation*, a case from the Eastern District of Pennsylvania that also analyzed the Cintas employment agreement at issue in this case, is instructive for this purpose. 229 F. Supp. 3d 312 (E.D. Pa. 2017). In *Curtis*, the plaintiff brought claims pursuant to Title VII of the Civil Rights of Act of 1964, 42 U.S.C. § 1981, and the PHRA following the termination of his employment. 229 F. Supp. 3d at 315. Cintas moved to compel arbitration. *Id.* Even though Curtis's complaint did not explicitly mention, incorporate, or attach the employment agreement, the *Curtis* court held that Rule 12(b)(6) provided the proper standard of review because the employment agreement was "clearly integral" to Curtis's claims and there was no dispute as to the authenticity of the copy of the agreement attached to Cintas's motion to compel arbitration. *Id.* at 315–16 (citing *Hewitt v. Rose Grp.*, No. 15-5992, 2016 WL 2893350, at \*2 n.1 (E.D. Pa. Mar. 21, 2016) ("It would frustrate the purposes of the Federal Arbitration Act if plaintiffs could avoid having their claims quickly compelled to arbitration simply by failing to mention the existence of clearly applicable arbitration agreements in their complaints.")).

As in *Curtis*, the Complaint is not the only relevant document at this juncture. *Cf. also Guidotti*, 716 F.3d at 777 (considering additional documents, such as loan application documents

and an agreement to arbitrate, in determining that there was a factual dispute as to whether a plaintiff agreed to arbitrate her claims). Here, Cintas supported its Motion with additional facts in the form of a sworn declaration by Jeff Borak, Cintas's General Manager at the Bridgeville, Pennsylvania location, (Borak Dec. ¶ 4), as well as a copy of the Agreement (facially appearing to have been signed by Mr. Davis) containing the agreement to arbitrate. (Exh. A, ECF No. 15-1).

Mr. Davis submitted a sworn declaration in opposition to the Motion. Mr. Davis declares that he did not sign the Agreement, or any form like it, *when he was originally hired in 1989*. (Davis Dec. ¶ 5). But, Davis acknowledges that he was "required to sign" a form like the copy of the Agreement attached to Cintas's Motion in order "to get an annual raise and to stay employed." (*Id.* ¶ 7). And, though Davis claims that Cintas did not "explain" the Agreement to him and he "wasn't given a copy of it," (*id.* ¶ 10), Davis does not deny signing the copy of the Agreement attached to Cintas's Motion, on which his signature facially appears, nor does he otherwise allege facts that could fairly call into question the authenticity of the copy of the Agreement.

These uncontested representations distinguish *Kirleis v. Dickie, McCamey, & Chilcote, P.C.*, 560 F.3d 156 (3d Cir. 2009), a case in which the Third Circuit held that a former law partner's affidavit that stated that the former partner 1) was never provided a copy of the firm by-laws which contained an agreement to arbitrate; 2) never signed an agreement referring to or purporting to incorporate the arbitration agreement in the firm by-laws, and; 3) never agreed to arbitrate any claims against the firm, created a factual dispute as to whether the former partner had agreed to submit her claims against her former firm to arbitration. *Id.* at 161–62. Here, Mr. Davis may not have received a copy of the Agreement for his records, but he admitted that he

-6-

signed a copy of the Agreement, and thus is presumed to have intended to assent to the Agreement and have knowledge of its contents. *See Petrie v. Haddock*, 119 A.2d 45, 47 (Pa. 1956) ("A party's signature to a contract is designed to evidence his intention to be bound thereby."); *see also Simeone v. Simeone*, 581 A.2d 162, 165–66 (Pa. 1990) ("Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood . . . *Ignorantia non excusat*.").

Rather, the facts of this case parallel those presented in *Morina v. Neiman Marcus Group, Inc.*, another case from the Eastern District of Pennsylvania. No. 14-1394, 2014 WL 4933022 (E.D. Pa. Oct. 1, 2014). There, an employer moved to compel arbitration and attached the pertinent agreement to arbitrate as an exhibit to its motion. *Id.* at *8. In a responsive declaration, the plaintiff acknowledged that he signed the form containing the agreement to arbitrate, but also asserted that he did not recall reading the form, was not provided a copy of the form, had difficulty understanding the English language, and did not have the form explained to him. *Id.* at *3. The fact that the plaintiff did not deny signing the form containing the agreement to arbitrate (and had in fact admitted that he did so) was sufficient for the *Morina* court to distinguish *Kirleis*, where there was a factual dispute as to whether the plaintiff actually signed the agreement or had the agreement presented to her. *Id.* at *8. And, unlike in *Guidotti*, where the plaintiff had only signed forms acknowledging that she had received other forms containing an agreement to arbitrate, it was explicitly clear on the face of the form signed by the plaintiff in *Morina* that the form contained a legally binding agreement to arbitrate. *Id.* The same is true of the Agreement in this case. It does not incorporate a separate agreement to arbitrate, rather the agreement to arbitrate appears conspicuously in the body of the Agreement as Section Eight. (Agreement at 5).

As in *Curtis* and *Morina*, the Court concludes that further discovery is unwarranted to decide the Motion before the Court and the Rule 12(b)(6) standard of review will be utilized. Accepting the facts pleaded in the Complaint and Mr. Davis's declaration as true, and construing them in the light most favorable to Mr. Davis, *see Curtis*, 229 F. Supp. 3d at 316 (citing Fed. R. Civ. P. 12(b)(6)), there are no facts in dispute regarding the formation of the Agreement, its terms, or the bargained-for exchange leading to its formation. Nor is the authenticity of the Agreement in dispute. Mr. Davis declared that he signed the Agreement, and his signature facially appears on the copy of the Agreement submitted as an exhibit to Cintas's Motion. Mr. Davis does not dispute the authenticity of the copy of the Agreement attached as an exhibit to Cintas's Motion, nor has he alleged any facts that could reasonably call the document's authenticity into question. Mr. Davis further declared that he signed the Agreement with the understanding that he would receive a raise and maintain his employment if he did so. Likewise, the Agreement facially indicates that Mr. Davis received a pay raise in exchange for assenting to the Agreement. Certainly, Mr. Davis raises *legal* arguments as to why the agreement to arbitrate in the Agreement is either excluded from the FAA or otherwise unenforceable (and these will be addressed), but the material *facts* surrounding his acceptance of the Agreement and its terms are not fairly in dispute. Neither party has identified a material factual dispute that necessitates further discovery, or has otherwise represented that this Motion cannot be resolved on the record currently before the Court. Thus, because there are no disputes as to the facts material to the question now before the Court, even if the Rule 56, *i.e.*, "summary judgment" standard of review applied, we end up in the same place.

### b. Choice of Law

The Agreement states that the entire Agreement is interpreted, governed, and enforced according to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and the substantive law of the state where employee currently works for Cintas or most recently worked for Cintas. (Agreement at 5). The Agreement does not expressly provide which law will apply to issues of contract formation, but it appears to the Court based on the briefing on this Motion that both parties agree that Pennsylvania law applies to this issue. The Court agrees. Pennsylvania law will be applied to all issues of contract formation because Mr. Davis worked for Cintas in Pennsylvania, (Compl. ¶ 9), Mr. Davis is a Pennsylvania resident, (*id.* ¶ 6), and Mr. Davis's Complaint includes a claim brought under Pennsylvania law, (*id.* ¶¶ 62–64). *Cf. Morina*, 2014 WL 4933022 at *10 (concluding that a protracted choice of law analysis was not necessary to determine that Pennsylvania contract law applied to issues of validity of an agreement to arbitrate under similar facts).

### c. There is a valid agreement to arbitrate that covers Davis's claims.

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate a dispute "shall be valid, irrevocable, and enforceable, save upon such grounds exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Similarly, under Pennsylvania law, "[a] written agreement to subject any existing controversy to arbitration or a provision in a written agreement to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity relating to the validity, enforceability or revocation of any contract." 42 Pa. C.S. § 7303. A party seeking to compel another party to submit claims to arbitration per the terms of a written agreement to arbitrate may petition a district court that would otherwise have jurisdiction over the controversy

"for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. An agreement to arbitrate found in an employment agreement is enforceable under the FAA unless it is specifically excluded by § 1 of the FAA. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001).

In order to compel an unwilling party to arbitrate its claims, "a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis*, 560 F.3d at 160 (citing *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005); *Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 283 n.3 (Pa. Super. Ct. 2005)). The question of whether an agreement to arbitrate creates a duty for parties to submit claims to arbitration is a matter of judicial determination. *Rite Aid of Pa., Inc. v. United Food & Commercial Workers Union*, 595 F.3d 128, 131 (3d Cir. 2010) (internal citations omitted). It is well-established that agreements to arbitrate are interpreted in favor of enforcement under the FAA. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (reiterating that the FAA "establishes a liberal federal policy favoring arbitration agreements") (internal quotations omitted); *Circuit City*, 532 U.S. at 111 (explaining that "a wide range of written arbitration agreements" are enforced under the FAA because "Congress enacted the FAA . . . [as] a response to hostility of American courts to the enforcement of arbitration agreements"). Pennsylvania courts have likewise adopted a policy strongly favoring enforcement of agreements to arbitrate. *See, e.g.*, *Moscatiello v. J.J.B. Hilliard*, 939 A.2d 325, 333 (Pa. 2007) ("Pennsylvania's arbitration acts . . . foster the federal policy favoring arbitration enforcement.").

The presumption in favor of arbitrability "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Kirleis*, 560 F.3d at 160 (quoting *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)) (internal quotation

marks omitted). In determining whether a valid agreement to arbitrate exists, a federal court applies ordinary state-law principles of contract law, and an agreement to arbitrate may only be found as a matter of law when there are no genuine disputes of material facts regarding formation of the agreement when viewed in the light most favorable to the nonmoving party. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288–89 (3d Cir. 2017). In doing so, the Court only determines whether the merits of the case should be arbitrated or litigated—the Court may not consider the merits of the underlying claims. *Morina*, 2017 WL 493302 at \*6 (citing *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir. 1997)). A district court has no discretion in determining whether to enforce the arbitration agreement if a valid agreement exists. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985). The same is true under Pennsylvania law. *See, e.g.*, *Highmark Inc. v. Hospital Serv. Ass'n of N.E. Pa.*, 785 A.2d 93, 98 (Pa. Super. Ct. 2001).

### i. The underlying claims are within the scope of the agreement to arbitrate.

Preliminarily, the claims of the underlying suit here fall within the scope of the agreement to arbitrate. Neither party contends otherwise. "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (collecting cases and holding that ADEA claims can be the subject of an arbitration agreement). Mr. Davis alleges violations of the ADA, ADEA, and PHRA, while the Agreement explicitly states that ADA claims, ADEA claims, and claims under state-law anti-discrimination statutes (which would include the PHRA) must be submitted to arbitration. (Agreement at 5).

## ii. The agreement to arbitrate is valid.

The Court also concludes that a valid agreement to arbitrate exists. Necessary elements of contract formation under Pennsylvania law are: "(1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." *Kirleis*, 560 F.3d at 160 (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)).

As discussed above, it is undisputed that Mr. Davis signed the Agreement, and he does not contend otherwise. "A party's signature to a contract is designed to evidence his intention to be bound thereby." *Petrie*, 119 A.2d at 47. Mr. Davis's assertions that the Agreement was not explained to him when he signed it do not negate this manifestation of an intention to be bound. *Simeone*, 581 A.2d at 165–66. Critically, Mr. Davis makes no declaration that he had not read the Agreement, that he did not understand what he was signing, that he was defrauded or coerced into signing the Agreement, or that there is any other reason to suggest that Mr. Davis did not intend to be bound by the Agreement notwithstanding his signature appearing on the Agreement. On these bases, the Court concludes that it is undisputed, based on Mr. Davis's admission that he signed the Agreement, that Mr. Davis manifested an intent to be bound by the terms of the Agreement, including the agreement to arbitrate.

The terms are also sufficiently definite to be enforced. The Agreement exhaustively and specifically enumerates the types of claims that must be submitted to arbitration, including ADA claims, ADEA claims, and claims brought pursuant to state-law anti-discrimination statutes, such as the PHRA. (Agreement at 5). The Agreement also outlines the manner of arbitration, a preliminary process for resolving disputes prior to arbitration, and the allocation of the costs of arbitration. (*Id.* at 5–6). Mr. Davis makes no arguments or assertions that the terms of the agreement to arbitrate are indefinite or unclear in any way.

It is unclear whether Mr. Davis is actually challenging whether there was sufficient consideration for the agreement to arbitrate to be enforceable. No such argument appears in any of Mr. Davis's briefing in opposition to this Motion or in any other papers filed in this case. It appeared to the Court that Mr. Davis argued during the Oral Argument that there was no consideration for the agreement to submit the claims of the litigation to arbitration, and Cintas argued otherwise. Whether this argument was improperly introduced for the first time at Oral Argument is unimportant, as the Court concludes that Mr. Davis's own admissions in his declaration foreclose any argument that consideration was lacking.[4]

"Consideration "confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise."" *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986) (quoting *Curry v. Thompson*, 481 A.2d 658, 661 (Pa. Super. Ct. 1984)). Mr. Davis himself declared that he was "required to sign" the Agreement "to get an annual raise and to stay employed." (Davis Dec. ¶ 7). Several district courts in the Third Circuit have applied Pennsylvania law in holding that continued employment is sufficient consideration for an agreement to arbitrate. *See Morina*, 2014 WL 4933022 at *10 n.6 (collecting cases). The Court is unaware of any precedential decision from the Third Circuit or Supreme Court of Pennsylvania expressly adopting such an interpretation of Pennsylvania law, nor is the Court aware of any decisions from these courts disavowing such an interpretation. However, this Court need not and does not decide whether continued employment is sufficient consideration. The Agreement itself facially states that the consideration for the Agreement was an increase in Davis's rate of compensation, (Agreement at 2), and Mr. Davis acknowledges this as well, (Davis Dec. ¶ 7).

---

[4] Cintas claimed during Oral Argument that Davis had not raised the issue of consideration prior to the Oral Argument.

-13-

There is nothing pled or alleged that suggests that Cintas was otherwise required to increase Davis's salary. In exchange for the benefit of an increased salary, Mr. Davis made certain promises to Cintas pursuant to the Agreement—including a promise to submit the enumerated claims in the Agreement to arbitration. The increased salary was plainly a tangible benefit conferred upon Mr. Davis, the promising party, and thus his promises to Cintas that were enumerated in the Agreement were supported by adequate consideration and are legally enforceable.[5]

Nonetheless, Mr. Davis provides two principal arguments as to why the Court should deny Cintas's Motion. First, Davis argues that the agreement to arbitrate is excluded under the FAA's "transportation worker exception" codified at 9 U.S.C. § 1. Davis also argues that the Agreement is unconscionable under Pennsylvania law and therefore unenforceable. The Court disagrees on both accounts and will address them in turn.

### d. The "transportation worker" exception does not apply.

Notwithstanding the broad scope of the FAA and liberal policy in favor of enforcement, the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. A court must determine whether the "contracts of employment" exception in § 1 applies to an agreement to arbitrate before arbitration can be compelled pursuant to § 4. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537–38 (2019). Neither party disputes that Mr. Davis's agreement with Cintas is a "contract of employment." And it is clear that Mr. Davis

---

[5] There are no facts pled or alleged as to how much Mr. Davis's salary was increased. However, for the purpose of determining whether this Agreement was supported by consideration, the amount of Mr. Davis's raise is not material. Courts in general do not entertain inquiries as to the adequacy of consideration. *See Hillcrest Found., Inc. v. McFeaters*, 2 A.2d 775, 778 (Pa. 1938) (observing that such a principle "is almost as old as the law of consideration itself"). That Mr. Davis received any increase in his salary, coupled with the fact that Mr. Davis does not argue that the increase in his salary was so minimal so as to be considered merely "nominal" consideration, is a sufficient basis for the Court to conclude that the Agreement was supported by consideration.

-14-

is not a seaman or railroad employee. Mr. Davis argues that he is part of a "class of workers engaged in foreign or interstate commerce," and Cintas disputes this.

As the party opposing arbitration, Davis bears the burden of proving that he is a member of a class of workers engaged in interstate commerce. *See, e.g.*, *Lee v. Postmates Inc.*, No. 18-03421, 2018 WL 6605659, at *7 (N.D. Cal. Dec. 17, 2018) (holding that the transportation worker exception did not apply because the plaintiff—a courier and the party opposing arbitration—failed to show that couriers employed by the defendant company were sufficiently engaged in interstate commerce); *see also Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987) ("The burden is on the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.").

The transportation worker exception in 9 U.S.C. § 1 is intended to be narrowly construed. *See, e.g.*, *Circuit City*, 532 U.S. at 119. In *Circuit City*, the Supreme Court held that the scope of the provision is narrower than the modern scope of the Commerce Clause and "exempts from the FAA only contracts of employment of transportation workers." *Id.* In clarifying the definition of "workers engaged in interstate commerce," the Supreme Court effectively endorsed the Third Circuit's interpretation of the scope of the transportation worker exception. *Compare id.* at 112 ("Most Courts of Appeals conclude the exclusion provision is limited to transportation workers, defined, for instance, as those workers "actually engaged in the movement of goods in interstate commerce."") (quoting *Cole v. Burns Int'l Security Sys.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997)), *with Peacock*, 110 F.3d at 227 ("[T]he only class of workers included within the exception to the FAA's mandatory arbitration provision are those employed *directly* in the channels of commerce itself.") (citing *Tenney Eng'g, Inc. v. United Elec. Radio & Machine Workers of Am.*, 207 F.2d 450 (3d Cir. 1953) (*en banc*)). A narrow construction was supported by "Congress' demonstrated

concern with transportation workers and their necessary role in the free flow of goods," as evidenced by Congress enacting more specific legislation to cover those workers engaged directly in transporting goods. *Circuit City*, 532 U.S. at 121.

This exception is not limited only to those workers that physically and personally transport goods across state lines. *See Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593–94 (3d Cir. 2004) (holding that a supervisor who directly supervised delivery drivers, but did not personally transport goods across state lines, was a "transportation worker engaged in interstate commerce" and thus her employment contract was exempt from the FAA). Nonetheless, a worker seeking to be exempt from the FAA must demonstrate that he is a member of a class of workers "actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." *Id.* at 593 (quoting *Tenney*, 207 F.2d at 452).

Several courts have had occasion to analyze whether different occupations fit within the narrow scope of the § 1 exception. It appears to be beyond dispute that truck drivers, bus drivers, and similar occupations are "actually engaged in interstate commerce" and are thus transportation workers. *See Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 351–52 (8th Cir. 2005) (citing *Harden v. Roadway Package Sys., Inc.*, 249 F.3d 1137 (9th Cir. 2001); *Am. Postal Workers Union v. U.S. Postal Serv.*, 823 F.2d 466, 473 (11th Cir. 1987)); *see also Oliveira*, 139 S. Ct. at 539 (noting that the parties did not dispute that the respondent, a truck driver, qualified as a worker engaged in interstate commerce). As an employee's duties become more attenuated from the actual flow of goods across state lines, courts are less likely to conclude that that employee's job is so "closely related" to interstate commerce so "as to be in practical effect part of it." *Tenney*, 207 F.2d at 452. For instance, a security agent at an airport who inspected goods

was held to not be a worker "engaged in commerce," *see Perez v. Global Airport Sec. Serv., Inc.*,

253 F.3d 1280, 1284 (11th Cir. 2001), nor was a security guard at a train station because he was

not "in the "flow" of commerce, *i.e.*, . . . responsible for the transportation and distribution of

goods," *see Cole*, 105 F.3d at 1472.

In another case involving Cintas seeking to compel arbitration, the Northern District of

California undertook a thorough analysis of pre- and post-*Circuit City* decisions determining

whether certain workers were "transportation workers" for the purposes of § 1 and synthesized

the following factors as relevant in making such a determination:

> • Whether, like seamen or railroad employees, the plaintiff-employee
>   class of workers (the "employee") is within a class of employees
>   "as to which special arbitration legislation already existed" at the
>   time the FAA was enacted;
> • Whether, like seamen (where the ship is the heart of the enterprise)
>   or railroad employees (where the train is the heart of the
>   enterprise), the vehicle itself is essential to the commercial
>   enterprise of the defendant-employer;
> • The nexus between the employee's job duties and the vehicle the
>   employee uses in carrying out his duties (*i.e.* a truck driver whose
>   sole job duty is to deliver goods cannot do so without a truck);
> • Whether the employee is employed in the transportation industry;
> • Whether the employee is directly responsible for the transporting of
>   goods in interstate commerce;
> • Whether a strike by the employee would interrupt interstate
>   commerce. *Texas & New Orleans R.R. Co.*, 281 U.S. [548, 561
>   (1930)].

*See Veliz v. Cintas Corp.*, No. C 03-1180, 2004 WL 2452851 (N.D. Cal. Apr. 5, 2004),

*modified on reconsideration on other grounds*, No. 03-01180, 2005 WL 1048699 (N.D. Cal.

May 4, 2005). The Eighth Circuit cited *Veliz* favorably and adopted its factors in synthesizing its

own non-exhaustive list of considerations to be used in determining whether a worker is a

"transportation worker." *Lenz*, 431 F.3d at 352. In addition to the factors in *Veliz*, the *Lenz* court

also considered "whether the employee is directly responsible for transporting the goods in

-17-

interstate commerce" and "whether the employee supervises employees who are themselves transportation workers, such as truck drivers." *Id.* This Court agrees with the reasoning and analysis of the *Veliz* and *Lenz* courts and will likewise apply the non-exhaustive factors discussed in those decisions in determining whether Mr. Davis is a member of a class of workers engaged in interstate commerce.

But first, there is another issue to be ironed out. The parties' papers and presentations at Oral Argument did not brightly illuminate whether the Court must look to Mr. Davis's personal and individual job responsibilities and duties in determining whether he is a worker engaged in interstate commerce, or whether the Court must answer this question in reference to the class of workers of which Mr. Davis is a part of—route sales drivers employed by Cintas.

The statutory text supports the latter reading, as it states that the exemption applies to "sea*men*, railroad *employees*, or any other *class of workers* engaged in foreign or interstate commerce." 9 U.S.C. § 1 (emphasis added). The structure of this text aligns and equates plural groups of employees ("seamen" and "railroad employees") with the phrase "class of workers," which suggests that all of the mentioned groups of employees are to be viewed in their entirety and as a class. Applied to this case, this would mean that Mr. Davis's agreement to arbitrate may fall within the § 1 exception if he is a member of a class of workers engaged in interstate or foreign commerce, notwithstanding the possibility that he himself is not personally engaged in interstate or foreign commerce through the course of his employment. Such a reading of § 1 has been endorsed by other courts. *See Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988) ("[T]he concern was not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce.") (citing *Tenney*, 207 F.2d at 452–53); *Postmates*, 2018 WL 6605659 at

*7 (holding that couriers for the defendant company, rather than any one particular worker, did not fall within the transportation worker exception); *Dancu v. Coopers & Lybrand*, 778 F. Supp. 832, 834 (E.D. Pa. 1991) (similar).

The Court is unaware of any contrary Third Circuit or Supreme Court precedent, and concludes that the relevant inquiry is whether route sales drivers at Cintas, the class of workers of which Davis is a member of, is a class of workers engaged in interstate or foreign commerce. However, this conclusion is not important to the resolution of this case, as Davis's arguments fail whether route sales drivers are analyzed as a group or whether Davis's personal job characteristics are analyzed.

Davis's arguments plainly fail if only his personal job characteristics are considered. Mr. Davis alleges in his Complaint that he "completed all of her [sic] associated work with Defendant within the Commonwealth of Pennsylvania in this district and therefore this district is the proper venue." (Compl. ¶ 10). And, based on Mr. Borak's unrebutted description of Cintas's business, Cintas is not a transportation company. Rather, Cintas is "a full-service uniform facility services company that processes, distributes, and delivers corporate-identity work uniforms and related facility service products to customers throughout the United States and Canada." (Borak Dec. ¶ 6).[6] Therefore, Mr. Davis could only be a "transportation worker" if he himself delivered goods in interstate or foreign commerce or directly supervised those who did. *See Palcko*, 372 F.3d at 593–94. There are no facts pled or declared that Mr. Davis supervised any workers directly engaged in interstate or foreign commerce, and he himself could not have personally

---

[6] Davis adopts this characterization of Cintas's business in his brief in opposition to this Motion, (ECF No. 20 at 3), and he neither pleads nor alleges any facts that contradict this characterization of Cintas's business. It thus appears to the Court that the parties do not dispute that Cintas is "a full-service uniform facility services company that processes, distributes, and delivers corporate-identity work uniforms and related facility service products to customers throughout the United States and Canada," and the Court will likewise accept this characterization of Cintas's business as true for the purposes of this Motion.

delivered any good in interstate or foreign commerce if, as he acknowledges, he never left Pennsylvania while working for Cintas.

Davis fairs no better when the responsibilities of route sales drivers are considered as a class. There are no facts in the pleadings or supporting documents from which the Court could conclude or infer that route sales drivers as a class are "transportation workers." In fact, the *only* description of the "route sales driver" position comes from Mr. Davis's declaration which reads, in its entirety:

> As a route sales driver, I delivered fresh uniforms, picked up dirty uniforms, and delivered other supplies such as paper towels and mats to Cintas customers. I serviced existing customers and tried to get customers interested in other Cintas products.

(Davis Dec. ¶ 3). *Circuit City*, *Tenney*, *Palcko*, and the balance of the applicable authority make clear that only those workers directly involved with interstate commerce are "transportation workers" and that this definition of "transportation workers" is very narrow. In simplest terms, "transportation workers" must be akin to railroad workers and seamen, the other two groups of exempted workers mentioned in § 1. Mr. Davis's description of route sales drivers cannot lead to an inference or suggestion that route sales drivers, as a class, are "transportation workers" in the same way that railroad workers and seamen are, even when viewed in the light most favorable to Davis.

First, the name of the position—route *sales* drivers—itself undercuts such an assertion. The title suggests that route sales drivers are at least partly responsible for selling (rather than just delivering) Cintas products. Mr. Davis's description of his job supports this. (Davis Dec. ¶ 3) ("I . . . tried to get customers interested in other Cintas products.").

Davis also describes his job at least partly as a service position, (Davis Dec. ¶ 3), which would also cut against any comparison to a railroad worker or seaman. It is clear from Mr.

-20-

Davis's own description of the route sales driver position that the role involved additional responsibilities beyond getting Cintas products from point A to point B. Granted, Mr. Davis alleges that route sales drivers spend at least *some* of their time delivering Cintas products, but he also says that route sales drivers provide customer service and try to sell Cintas products. Further, there are no facts pled or asserted that any deliveries or pickups are made across state lines, as would be required to be involved in interstate commerce for these purposes, nor any basis to conclude that Mr. Davis's "delivery" duties predominated over his customer service and sales duties. *Cf. Lenz*, 431 F.3d at 353 (holding that a customer service representative is not a transportation worker in part because his "central task was to answer the questions of and provide information to [] customers, not to supervise packages moving in interstate commerce").

Mr. Davis also makes no effort to distinguish the *Veliz* case in which Cintas "Service Sales Representatives"[7] were held to *not* be transportation workers for § 1 purposes and therefore not exempt from the FAA. 2004 WL 2452851 at *10. The *Veliz* court analyzed the duties of Service Sales Representatives using the factors it identified (discussed above) in reaching that conclusion.

> Applying the factor test the Court previously set out underscores this conclusion. Congress has not provided separate federal legislation regarding employees who deliver products as part of their customer service duties. Cintas is not in the transportation industry. While the SSRs are directly delivering their employers' goods to customers, it is not clear that the SSRs' vehicles are essential to the transporting of Cintas' goods. Cintas could, for example, employ a different business model involving a third party courier service and, no customer service. In other words, the nexus between the SSR's job duties—customer service—is not so close to the SSR's use of the vehicle as to be inextricably intertwined. Nor would a strike by SSRs disrupt interstate commerce. While such a strike would certainly disrupt *service* to Cintas' customers,

---

[7] As mentioned above, *see supra*, note 1, counsel for Davis represents in Davis's Response to the Motion to Compel Arbitration (ECF No. 20) that "Service Sales Representatives" and "route sales drivers" are the same position. (*Id.* at 3).

> it would not otherwise interrupt the free flow of *goods* to third
> parties in the same way that a seamen's strike or railroad
> employees' strike would.

*Veliz*, 2004 WL 2542851 at *10. Of course, the conclusions of the Northern District of
California are not binding in this Court in this case. Mr. Davis was not a party to the *Veliz*
litigation nor does the Court have any reason to believe that any of the plaintiffs in *Veliz* were
representing Mr. Davis's interests. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329–
31 (1979). That being said, Mr. Davis has not advanced any arguments, factual allegations, or
assertions to call the *Veliz* court's reasoned and thorough analysis into question.

The Court likewise concludes that, on the record here, Mr. Davis has not created a
genuine issue that would contravene the conclusion that Cintas route sales drivers are not
transportation workers. An application of the factors enumerated in *Veliz* and *Lenz* supports such
a determination. There was no "special arbitration legislation" covering route sales drivers at the
time the FAA was enacted. *Cf. Circuit City*, 532 U.S. at 121 (noting that Congress reserved "for
itself more specific legislation for those engaged in transportation," such as the amendment of
the Railway Labor Act in 1936 to include air carriers). There is no suggestion that the particular
vehicles used by Cintas route sales drivers are essential to Cintas's enterprise—especially not in
the same sense that a locomotive is essential to a railroad worker or a ship is to a seaman. As
discussed, Cintas is "a full-service uniform facility services company," *i.e.*, not a transportation
company. (Borak Dec. ¶ 6). It appears that at least a portion of Cintas's business is devoted to
delivery services, but these delivery services are limited to Cintas's own products rather than to
the transportation of goods in general. That is, Cintas's business revolves around servicing
(including delivering) and selling its *products* rather than selling transportation or delivery
services as such. (*See id.*). And, a strike by all Cintas route sales drivers would not meaningfully

interrupt interstate commerce. Cintas route sales drivers are responsible for delivering Cintas goods to Cintas customers and providing customer service for those goods. A strike by all of them would have no effect beyond the Cintas customer base, and the macro flow of goods in interstate commerce would be largely uninterrupted. And finally, Mr. Davis does not supervise any employees who are transportation workers, such as truck drivers. *Cf. Palcko*, 372 F.3d at 593–94 (holding that an employee that did not personally transport goods in interstate commerce, but directly supervised delivery drivers engaged in interstate commerce, was a transportation worker).

Only two of the *Veliz/Lenz* factors even slightly weigh in favor of concluding that route sales drivers are transportation workers. Viewing all allegations in favor of Mr. Davis, and analyzing route sales drivers as a class, it could be argued that route sales drivers are directly responsible for the transporting of goods in interstate commerce because Mr. Borak declared that Cintas products are delivered "to customers throughout the United States and Canada." (Borak Dec. ¶ 6). And, it appears clear to the Court that it would be nearly impossible for route sales drivers to perform their duties (as described by Mr. Davis) without a vehicle. But even giving Mr. Davis the benefit of every reasonable inference and weighing these factors in his favor, the balance of the *Veliz/Lenz* factors indisputably demonstrates that route sales drivers are not among the narrow scope of workers "engaged in interstate commerce" for purposes of the "transportation worker" exception. Accordingly, the Court concludes that Mr. Davis is not a member of a class of workers "engaged in interstate commerce" and thus his contract of employment and agreement to arbitrate are not exempt from the FAA.[8]

---

[8] Cintas also argues that arbitration would nonetheless be compelled under Pennsylvania law even if it would be determined that Davis's contract of employment was exempt from the FAA. The Court notes that it appears that this argument may be meritorious. *See, e.g.*, *Palcko*, 372 F.3d at 596 (recognizing that an arbitration agreement exempt from the FAA was still enforceable under Washington state law). The Court is unaware of a "transportation worker"

e. The agreement to arbitrate is not unconscionable.

Mr. Davis also argues that the Court should refuse to enforce the agreement to arbitrate because it is unconscionable. To prevail with that argument, Mr. Davis has to fulfill both parts of a two-part test: "[t]o prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable." *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 225, 230 (3d Cir. 2012) (citing *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007)). A showing of both procedural and substantive unconscionability is necessary—demonstrating only one or the other will not suffice. *See Edwards v. HOVENSA, LLC*, 497 F.3d 355, 362–64 (3d Cir. 2007) (holding that an agreement to arbitrate was not unconscionable despite concluding that the agreement was procedurally unconscionable as a contract of adhesion because the contract was not substantively unconscionable); *Porreca v. Rose Grp.*, No. 13-1674, 2013 WL 6498392, at *16 (E.D. Pa. Dec. 11, 2013) (similar). The Third Circuit has predicted that the Pennsylvania Supreme Court might employ a "sliding-scale" approach in certain circumstances, such that "where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required" and vice versa. *Quilloin*, 673 F.3d at 230 (quoting *Salley*, 925 A.2d at 125 n.12). But "[e]ven under the "sliding-scale approach" . . . there still must be some threshold showing on *both kinds* of unconscionability." *Williams v. Nabors Drilling USA, LP*, No. 13-1013, 2014 WL 710078, at *8 (W.D. Pa. Feb. 25, 2014) (internal citations omitted) (emphasis added).

A contractual provision is procedurally unconscionable "where there was a lack of meaningful choice in the acceptance of the challenged provision" and substantively

---

exemption under Pennsylvania law, but also notes that, unlike in *Palcko*, the Agreement here does not contain a contingency stating that Pennsylvania (or any other state) law will apply if the FAA is held to be inapplicable. *Cf. id.* Therefore, the Court need not and does not reach the issue of whether compliance with this agreement to arbitrate could be compelled under Pennsylvania law because the Court concludes that Mr. Davis's agreement to arbitrate is not exempt from the FAA.

unconscionable where "the provision unreasonably favors the party asserting it." *Salley*, 925 A.2d at 119. The party challenging the provision bears the burden of proof of establishing both procedural and substantive conscionability. *Id.* at 119–20.

Mr. Davis's arguments that the agreement to arbitrate is unconscionable do not carry the day for him. He argues that the agreement to arbitrate is substantively unconscionable because it requires Mr. Davis to submit almost all of his likely claims against Cintas to arbitration whereas Cintas retains the right to litigate its likely claims against its employees in court. This argument was raised to and rejected by the Third Circuit (applying Pennsylvania law) in similar circumstances because equivalent obligations are not required for a valid arbitration agreement. *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) ("It is of no legal consequence that the arbitration clause gives Green Tree the option to litigate arbitrable issues in court, while requiring the Harrises to invoke arbitration."). Further, the Third Circuit has held that an arbitration agreement is not substantively unconscionable, even if it requires an employee to submit all of his claims to arbitration, if the agreement "does not alter or limit the rights and remedies available to that party in the arbitral forum." *Edwards*, 497 F.3d at 364 (applying *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)). Nothing in this agreement to arbitrate limits or alters the rights available to Mr. Davis in an arbitral forum, so the Court concludes that this agreement to arbitrate is not substantively unconscionable.[9]

This conclusion alone is sufficient to determine that enforcement of the agreement to arbitrate should not be denied on the basis of unconscionability. *See Edwards*, 497 F.3d at 362– 64. However, in the interest of a complete analysis, the Court will also consider whether the agreement to arbitrate is procedurally unconscionable. "Procedural unconscionability bears on

---

[9] Mr. Davis makes no allegations that submission of his claims to arbitration would in any way limit or alter the rights available to him.

the circumstances surrounding the manner in which an agreement is reached, along with the form and appearance of the agreement itself." *Estate of Hodges v. Meadows*, No. 12-cv-01698, 2013 WL 1294480, at \*6 (E.D. Pa. Mar. 29, 2013). Under Pennsylvania law, contracts of adhesion—defined as "standard-form contract[s] prepared by one party, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms"—are usually procedurally unconscionable. *Quilloin*, 673 F.3d at 235 (quoting *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1190 (Pa. 2010)).

To be clear at the outset, there is not an issue with the literal form of the Agreement or the manner in which the agreement to arbitrate was presented. *See Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) (explaining that "fine print and convoluted or unclear language" can lead to a finding of procedural unconscionability). The Court has reviewed the copy of the Agreement and notes that the agreement to arbitrate appears conspicuously in legible, standard-sized type. The Agreement itself is only seven pages in total and is written in straightforward and simple language. *Cf. Porreca*, 2013 WL 6498392 at \*10 (concluding that an eight-page, single-spaced, arbitration agreement written in standard English did not have the "appearance" of a procedurally unconscionable agreement).

Mr. Davis argues that his Agreement with Cintas was a contract of adhesion and that he was presented with no meaningful choice but to sign the Agreement. It could be fairly characterized based on the representations of the parties that there was a disparity in bargaining power when Mr. Davis entered into the Agreement, and in certain respects was presented as a "take it or leave it" decision to Mr. Davis—either sign the Agreement or lose his job at Cintas. But more than a disparity of bargaining power is needed in order to show that an arbitration agreement was not entered into willingly. *See Peacock*, 110 F.3d at 229.

-26-

Beyond that, several cases from the Third Circuit illustrate the importance of the characteristics of the employee claiming that an agreement to arbitrate is procedurally unconscionable. For example, the Third Circuit held that the arbitration agreement in a "standard form contract" that was presented to crane operators with minimum education as a condition of their employment was procedurally unconscionable. *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 266 (3d Cir. 2003). The Third Circuit then relied on *Alexander* in concluding that a contract that was presented to an employee on a "take it or leave it" basis with no opportunity for negotiation was procedurally unconscionable, notwithstanding the fact that the employee was college-educated, but because the employee also did not have other meaningful employment opportunities and relied upon the job offer for his immigration status. *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191 (3d Cir. 2010). Likewise, the Eastern District of Pennsylvania concluded in *Porreca* that a "take it or leave it"-style agreement to arbitrate in an employment agreement was procedurally unconscionable when a "restaurant management behemoth" presented the agreement to a potential employee who was an indebted college dropout and "economically compelled" to accept the terms of the agreement. No. 13-1674, 2013 WL 6498392 (E.D. Pa. Dec. 11, 2013). The *Porreca* court also credited the fact that the agreement was a non-negotiable condition of employment in concluding that it was procedurally unconscionable. *Id.* at \*8. However, the *Porreca* court also concluded that some of the plaintiff's arguments in that case— which mirror some of Mr. Davis's arguments here—were unimportant, such as the employer failing to explain terms of the agreement and the length and format of the agreement (eight single-spaced pages). *Id.* at \*8–\*10.

On the other hand, the Third Circuit concluded that an agreement to arbitrate was not procedurally unconscionable when presented in an employment agreement to a "Harvard-

educated economist" with multiple job offers who had voiced dissatisfaction with other elements of the agreement. *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 229 (3d Cir. 2008). Nor was an agreement to arbitrate in an employment agreement, presented as a condition of employment, procedurally unconscionable when signed by a college graduate who did not allege that she had not read the relevant arbitration provisions in the agreement or that the terms were otherwise kept hidden from her. *Peacock*, 110 F.3d at 228–29; *see also Quilloin*, 673 F.3d at 236–37 (concluding that an agreement to arbitrate was not procedurally unconscionable under essentially the same facts).

The record facts of this case lay somewhere in between these other cases. Mr. Davis's declaration contains little to no details about Mr. Davis's personal characteristics, educational background, or alternative employment prospects, factors important to the holdings in *Porreca*, *Alexander*, and *Quilloin*. On one hand, there is no basis to conclude that Mr. Davis was as limited in his educational background or alternative employment opportunities as the crane operators in *Alexander* were, and certainly no suggestion that he was dependent on employment with Cintas for his immigration status as was the jeweler in *Nino*. Nor is there a basis to conclude that Mr. Davis's economic situation was as dire as the young employee in *Porreca* who was plagued by student loan debt. On the other hand, there is no basis to infer that Mr. Davis was as sophisticated as the highly-educated economist in *Zimmer*, or even that he had a college degree as did the plaintiffs in *Peacock* and *Quilloin*.

Because Mr. Davis is the non-moving party, the Court will not draw any adverse inferences against Mr. Davis due to this lack of information. However, to carry the argument he makes, Mr. Davis has the burden of demonstrating that the agreement to arbitrate was procedurally unconscionable. Even when viewing Mr. Davis's declaration as true, only one of

-28-

his declared facts supports his contention—that he needed to sign the agreement to "stay employed" at Cintas. (Davis Dec. ¶ 7). Notwithstanding the "lack of information about the circumstances under which [he] was asked to sign the documents mak[ing] it difficult to assess the degree of compulsion" encountered by Mr. Davis, "it is plausible that, when presented with a job or no job scenario, [Davis] didn't feel that [he] had a meaningful choice." *See Stycyznski v. MarketSource, Inc.*, 340 F. Supp. 3d 534, 546 (E.D. Pa. 2018) (citing *Quilloin*, 673 F.3d at 235–37). Undoubtedly, this factor weighs in favor of concluding that there is "some degree of procedural unconscionability" in this arbitration agreement, but this factor alone, presented without the context of Mr. Davis's overall economic situation, is not dispositive. *Id.* (ultimately concluding that an agreement to arbitrate presented to an employee who would "lose her job" if she did not agree to it was not procedurally unconscionable).

Other factors weigh against concluding that this agreement to arbitrate was procedurally unconscionable. As in *Peacock* and *Quilloin*, Mr. Davis never alleges that he failed to read the Agreement. There are no specific allegations pled of fraud or coercion, and Mr. Davis does not allege that he did not understand what he was signing. He declares that he was not given a copy of the Agreement, that Cintas did not explain the Agreement to him, and that he "had to" sign it. But there is no requirement under Pennsylvania law that an employer must explain an employment agreement to an employee, nor any requirement that the employer must make a copy of the agreement available for an employee's retention. *See Porreca*, 2013 WL 6498392 at *9 ("If Defendant provided this agreement to Plaintiff in clear form and language, the Court is aware of no additional requirement to conduct an orientation to discuss the terms of the agreement with the employee and ensure that the employee understands all of its terms.").

Ultimately, there are insufficient facts alleged or declared by Mr. Davis such that it could be definitively concluded that Mr. Davis lacked a meaningful choice in accepting the Agreement. Mr. Davis claims (in his brief) that he did not have an opportunity to negotiate the terms of the Agreement, but does not allege that he sought to negotiate them, was told that he could not negotiate them, or had raised objections to them in any way. Certainly, there was a disparity in bargaining power—as there often is in employee-employer negotiations—but the Third Circuit and Supreme Court have clearly announced that a disparity of bargaining power, alone, is not sufficient to establish procedural unconscionability. *See Quilloin*, 673 F.3d at 235 (citing *Gilmer*, 500 U.S. at 32–33; *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 (Pa. 1981)). Mr. Davis has advanced no other facts—such as his degree of economic compulsion, his education level, his alternative employment opportunities, or lack thereof if he would not have signed the Agreement—that could permit the Court to conclude that his agreeing to submit his claims to arbitration "violate[d] strong public policy" rather than exemplified an "acceptable bargaining situation" notwithstanding the disparate degrees of bargaining power. *Quilloin*, 673 F.3d at 235 (internal quotations omitted). For all of these reasons, the Court concludes that Mr. Davis failed to carry his burden of demonstrating that the agreement to arbitrate was procedurally unconscionable.

However, to reiterate, even if the Court concluded otherwise as to the issue of procedural unconscionability based on Mr. Davis's bald assertion that he had to sign the Agreement to keep his job, the Court would nonetheless be required to conclude that the Agreement was not unconscionable as a matter of law because the Agreement is not substantively unconscionable. Pennsylvania law is clear that both procedural and substantive unconscionability must be demonstrated for a contract to be unenforceable due to unconscionability. *Edwards*, 497 F.3d at

362–64. And, because there has been no threshold showing of any substantive unconscionability at all, unconscionability cannot be demonstrated here even under a "sliding-scale" approach. *See Williams*, 2014 WL 710078 at *8.

### f. The case will be stayed pending arbitration.

The final matter in dispute between the parties is whether this case should be dismissed or stayed pending arbitration. Cintas moved to dismiss this action in its entirety, or in the alternative, to stay the proceedings pending arbitration. (ECF No. 14). Mr. Davis opposes dismissal, raising concerns with applicable statutes of limitations. (ECF No. 20 at 6). If a court determines that an issue in a case or proceeding is referable to arbitration it must, upon application of one of the parties, stay the proceedings until the conclusion of arbitration. 9 U.S.C. § 3; *see also DCK N. Am., LLC v. Burns & Roe Servs. Corp.*, 218 F. Supp. 3d 465, 471 (W.D. Pa. 2016) (citing *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 181–82 (3d Cir. 2010); *Lloyd v. HOVENSA, L.L.C.*, 369 F.3d 263, 269 (3d Cir. 2004)). District courts in the Third Circuit have no discretion in deciding whether to stay or dismiss the proceedings upon determining that any of the claims or issues are referable to arbitration. If one of the parties applies for a stay, a stay must be granted. *Lloyd*, 369 F.3d at 269.

Mr. Davis argues that it would be manifestly unjust to dismiss the case because the agreement to arbitrate only allows claims to be submitted within one year of the occurrence of the event giving rise to the dispute or within one year of the employee's employment ending. (Agreement at 6). According to Mr. Davis, because it has been over a year since Mr. Davis's employment was terminated, (Compl. ¶ 35), this provision would effectively time-bar his claims. This reading of the Agreement is incorrect. The Agreement provides that a one-year time limit applies "unless a party claims a violation of a specific statute having its own specific statute of

limitations, in which event that statutory time limit will apply." (*Id.*). Thus, to the extent that Mr. Davis argues that dismissal would be manifestly unjust because it would alter the statutory period otherwise applicable to his claims, this argument is without merit.

It is unclear whether Davis actually applied for a stay, as the entirety of his argument opposing dismissal of the action is contained within three sentences on the last page of his brief in opposition to the Motion. (ECF No. 20 at 6). Nonetheless, Mr. Davis clearly opposes dismissing the action and Cintas has, as an alternative ground for relief, requested a stay. Based on *Lloyd* and the mandatory language of 9 U.S.C. § 3,[10] the Court concludes that staying the proceedings pending arbitration is the appropriate course of action.

\* \* \*

---

[10] The statute reads in its entirety: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties* stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3 (emphasis added).

## III.  CONCLUSION

For the foregoing reasons, Cintas's Motion to Compel Arbitration (ECF No. 14) is GRANTED IN PART and DENIED IN PART. The case will be stayed and administratively closed pending arbitration, and the parties will be ordered to comply with the terms in the Agreement and proceed forthwith to arbitration in the manner outlined in the Agreement. The balance of the relief sought in Cintas's Motion at ECF No. 14 will be denied.

The Plaintiff shall file a notice upon the docket when the arbitration is completed, and may thereafter move to lift the stay, for good cause shown.

An appropriate Order will issue.

Mark R. Hornak
Chief United States District Judge

Dated: May 23, 2019

cc:     All counsel of record